**JAMES J. O'ROURKE, INC., et al.**

v.

**INDUSTRIAL NATIONAL BANK OF R.I. et al.**

**SYDNEY SUPPLY CO.**

v.

**INDUSTRIAL NATIONAL BANK OF R.I., et al.**

**No. 81–430–Appeal.**

Supreme Court of Rhode Island.

July 6, 1984.

---

Girard R. Visconti, Thomas W. Heald, Abedon & Visconti, Melvin A. Chernick, Providence, for plaintiffs.

John D. Deacon, Jr., Edwards & Angell, Providence, for defendants.

## OPINION

KELLEHER, Justice.

The plaintiffs in both of the above cases have appealed a Superior Court justice's denial of their motions for partial summary judgment and the granting of an identical motion made by the defendants.[1] The issue before us is whether or not a facility owned and financed by the Rhode Island Port Authority and Economic Development Corporation (Port Authority) but operated exclusively by private industry is a "public work" as that term is defined in the provi-

sions of G.L. 1956 (1977 Reenactment) § 37-13-14.

Initially, we would point out that the Port Authority is a public corporation that was established in 1974 with the passage of P.L. 1974, ch. 100, for the express purpose of promoting economic development within the state by the acquisition and development of real and personal property. *Opinion to the Governor,* 113 R.I. 586, 324 A.2d 641 (1974). General Laws 1956 (1977 Reenactment) § 42-64-30 and the other sections of the Rhode Island Port Authority and Economic Development Act were part of a comprehensive legislative attempt to reverse the deteriorating economic conditions then prevalent in the state by attempting to " 'retain existing industries and to induce, encourage and attract new industries through acquisition, construction, reconstruction and rehabilitation * * * ' " of industrial and recreational facilities, as well as all other aspects incident thereto. 113 R.I. at 593, 324 A.2d at 645. One of the evident, although unstated, purposes behind this legislation was the creation of an agency that could provide financing for the much-sought-after economic development through the issuance of industrial-development bonds, the interest on which would be tax exempt under § 103 of the Internal Revenue Code.[2]

During the mid-1970s, Daniele Prosciutto, Inc. (DPI) contacted the Port Authority with a business proposition; DPI, wishing to build a meat-processing[3] facility on a parcel of real estate in Burrillville, asked the Port Authority to finance the project by issuing tax-exempt Industrial Development Bonds (bonds). The Port Authority responded to the request by the adoption of a November 24, 1975 resolution that autho-

---

1. Although the defendants in each case filed an affidavit and a memorandum in support of their motion for a partial summary judgment and the respective plaintiffs proceeded as if such a motion had been filed, the record indicates that no such motions were filed. However, on this record the entry of summary judgment for the nonmoving parties finds overwhelming support. *Thomas v. Ross,* 477 A.2d 950, at 952–953

(1984); *Berberian v. O'Neil,* 111 R.I. 354, 356 n. 2, 302 A.2d 301, 302 n. 2 (1973).

2. 26 U.S.C.A. § 103 (West 1984).

3. The meat DPI planned to process was prosciutto, a dry-cured spiced ham, often referred to locally as "Italian ham."

rized the issuance of bonds totaling $2,100,-000.

The following events occurred at the bond-sale closing. The Port Authority sold the bonds to Industrial National Bank of Rhode Island (bank); and DPI, which had purchased the property prior to the closing, transferred legal title to the Port Authority, which in turn immediately leased the property back to DPI. The lease payments were set equal to the debt service on the bonds, and the lease allowed DPI to purchase the property for $1 when the bonds were redeemed. The Port Authority "mortgaged, pledged and assigned" all of its interest in the real estate and the meat-processing facility as well as its interest in the DPI lease to Industrial National Bank of Rhode Island as Trustee (trustee), so that DPI was to make all payments directly to the trustee. A Guaranty Agreement was executed by DPI with the trustee whereby DPI unconditionally guaranteed payment of the principal, interest, and any premium on the bonds. The bond-sale proceeds were deposited by the Port Authority into a construction fund held by the trustee; the DPI also agreed to pay any costs in excess of the amount placed in the construction fund.

Daniele Prosciutto, Inc. hired John B. Thell, Inc. (Thell), and Arctic Insulators and Constructors, Inc. (Arctic), as general contractors to build the facility and immediately assigned the construction contracts to the Port Authority. Thell was to perform the exterior work (walls, roof, and floor) and Arctic was to perform the interior work (heating, cooling, and ventilating systems) and to install the necessary meat-processing equipment. Thell was required by DPI to post, and did so post, a labor-and-material-payment bond. Arctic was not required to do so and did not post any such bond, which is exactly why this litigation arose. Arctic entered into subcontracts with James J. O'Rourke, Inc., Sydney Supply Co., and others (plaintiffs), all of whom supplied materials and/or performed labor on the building. Although Arctic received payment for this work, it went bankrupt before paying plaintiffs.

With Arctic in bankruptcy, plaintiffs instituted this litigation, in which they claim that the Port Authority, DPI, and the bank were negligent in failing to require Arctic to furnish the construction bond referred to in § 37–13–14. This statute expressly provides that the contractor to whom a public-works contract is awarded by the state, municipality, "agency or committee therein" must furnish a labor-material bond that would protect the interests of subcontractors and materialmen such as plaintiffs.

The defendants' response to plaintiffs' claim is § 42–64–30, which, in its pertinent part, states that "the construction and acquisition of any project undertaken pursuant to this chapter need not comply with any provision of any other state law applicable to such contracts for the construction and acquisition of state owned property." For reasons that follow, we shall affirm the dismissal of plaintiffs' complaint since, in our opinion, the development of DPI's parcel and the construction of its prosciutto-processing plant does not constitute a public-works project.

Section 37–13–1 defines "public works" as being

> "any public work consisting of grading, clearing, demolition, improvement, completion, repair, alteration or construction of any public road or any bridge, or portion thereof, or any public building or portion thereof, or any heavy construction, or any other public works projects of any nature or kind whatsoever."

The irrelevancy of § 37–13–14 to this dispute becomes apparent when one realizes that the "contractor" who is obligated to obtain the labor-and-materials bond prescribed by § 37–13–14 is described by the terms of § 37–13–2 as "the bidder whose bid has been accepted by an authorized agency or awarding authority as the bidder possessing the skills, ability and integrity necessary to the faithful performance of the contract * * *." Here, at no time was the Port Authority soliciting bids nor was

DPI submitting bids; DPI's project came to light from the initiative of its officials, who were instrumental in purchasing the Burrillville parcel and obtaining the assistance of the Port Authority. Thereafter, it was the bank that supplied the necessary financing, and today DPI's facility, like so many similar endeavors, stands as compelling evidence that the state and the private sector can work together to promote the common good.

It is also obvious that DPI's processing plant cannot be classified as a public work. By no stretch of the imagination can the plant be considered a public building; it is not open to the general public and no governmental functions are conducted on its premises. The project was not constructed with public funds, and the necessary private capital was supplied by the bank. Whatever profits result from the sale of DPI's dried, cured, and spiced hams will be earmarked for DPI's shareholders rather than the State of Rhode Island.

Finally, we would note that the court believes that the language of § 42–64–30 exempting the acquisition of sites and the construction of Port Authority projects from any statutes applicable to the "contracts for the construction and acquisition of state owned property" places any construction or acquisition initiated pursuant to chapter 64 of title 42 beyond the reach of title 37 as well as any general or public law of similar tenure.

The losses incurred by the plaintiffs because of Arctic's bankruptcy are unfortunate, but this litigation can afford the plaintiffs no relief.

The plaintiffs' appeals are denied and dismissed, the judgments[4] appealed from are affirmed, and the cases are remanded to the Superior Court.

---

4. The plaintiffs have filed two appeals. One is from the grant of summary judgment in favor of the defendants on the counts in their complaints which related to the failure to file a labor-and-material-payment bond pursuant to G.L. 1956 (1977 Reenactment) § 37–13–14. The other appeal relates to the remaining counts in their complaints. The remaining counts, with the exception of one, sought recovery of damages on the theory that plaintiffs were third-party beneficiaries of the agreement entered into by DPI, the Port Authority, and the bank. The final count sought to impose an equitable lien on the proceeds of the construction fund. The trial justice who considered the third-party-beneficiaries and lien claims rejected the idea that plaintiffs could be considered third-party beneficiaries and dismissed the equitable-lien count as being moot because at the time of the hearing all of the fund's contents had been expended. Although plaintiffs filed an appeal from this latter decision, they have briefed and argued only the issues relating to summary judgment involving the so-called public-works question. Consequently, their failure to brief and argue their third-party-beneficiaries claim constitutes a waiver. Claims of error that are unsupported by either argument or citation of authority are entitled to no consideration on review. *Mercurio v. Fascitelli*, 116 R.I. 237, 354 A.2d 736 (1976).